UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO.: 19-cv-20289-GOODMAN

NANCY GOULD,

     Plaintiff,

v.

CARNIVAL CORPORATION,

     Defendant.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING BENCH TRIAL

Nancy Gould was a passenger on Carnival Corporation's *Liberty* and was walking up the gangway while the cruise ship was docked in Nassau, The Bahamas. A man in front of her charged at a woman and took a swing at the woman. That woman fell into Ms. Gould, who then fell off the gangway and hit her head on the pier. Ms. Gould says she suffered a severe concussion, a traumatic brain injury, and debilitating migraine headaches due to her fall off the gangway.

Ms. Gould filed a lawsuit, but not against the fellow passenger whose actions caused his female companion to push into her. Instead, she sued Carnival, the defendant in this lawsuit.

Plaintiff testified that the man had, several minutes earlier, also punched the same

woman in the head (in front of Ms. Gould and her daughter) while they were on the pier in Nassau, walking back to the ship.

Her theory of liability against Carnival is that an employee from *another* cruise ship witnessed the earlier punch, scurried down the pier toward the *Liberty* and made gestures to a *Liberty* employee to indicate that the man had punched his companion – and that Carnival negligently failed to prevent the man from pushing the woman on the gangway while Ms. Gould and her daughter were directly behind them.

After a four-day Zoom bench trial, the Undersigned finds that Ms. Gould has not established by a preponderance of the evidence that a Carnival employee had been given notice (through the alleged gesture) of the earlier physical confrontation on the pier or that Carnival breached any type of duty it owed to her. Given this finding, there is no need to determine whether Ms. Gould sustained injuries proximately caused by the fall, the scope of those injuries, whether pre-existing physical conditions explain her current alleged symptoms, whether she needs future medical care or whether she has a valid claim for lost wages and past and future pain and suffering. Nevertheless, this ruling will discuss Ms. Gould's physical condition and medical history because it impacts her credibility.

The Undersigned concludes that Ms. Gould has not prevailed and that a defense judgment in Carnival's favor is appropriate.

## I.      Introduction

1.      Plaintiff was a passenger aboard Defendant's vessel, the *Carnival Liberty*, on May 18, 2018, the date of the incident. [ECF No. 19, ¶ 11].

2.      Plaintiff's Complaint alleges that, while the vessel was in Nassau, The Bahamas, she was conversing with her daughter in line on the gangway ramp to return onboard.[1] Suddenly, a man violently pushed a woman,[2] who fell into Plaintiff, knocking her to the ground. Plaintiff alleges that "[a]s a result of the fall, [she] suffered injuries that included, but are not limited to, a severe concussion and traumatic brain injury." [ECF No. 19, ¶ 22].

3.      Plaintiff alleged a single count of negligence against Carnival. [ECF No. 19, ¶ 32].

---

[1]      The entrance to the vessel will be referred to as the "clamshell door." The ramp connecting the pier to the clamshell door will be referred to as the "gangway ramp," which is sometimes described as the "gangplank" in testimony and documentary evidence. The onboard security checkpoint, i.e., the area just inside the clamshell door, which includes an x-ray machine, metal detector, and machines to swipe Sign-and-Sail identification cards, will be referred to as the "gangway security checkpoint." The term "gangway" will be used when referencing these areas as a whole.

[2]      The man is passenger Shawn Johnson and the woman passenger is Robyn Berry. Both were sailing on the *Liberty*. They will be referred to as Johnson and Berry. Neither testified at the trial and neither gave pre-trial deposition testimony.

II.     **Trial Testimony and Evidence**

<u>Plaintiff's Case</u>

A.      The Plaintiff, Nancy Gould, testified as follows:

1.      Plaintiff, a blackjack dealer, is a Kentucky native who lives in the tri-state, Cincinnati region with her 7-year-old daughter, A.G. [ECF No. 184, pp. 41–43:6–6].

2.      On May 17, 2018, Plaintiff, her ex-husband (William Gould), and A.G. boarded the *Carnival Liberty* for a cruise to The Bahamas to celebrate Plaintiff's birthday. [ECF No. 184, pp. 43–45:14–7].

3.      At the time of the cruise, Plaintiff weighed approximately 330 pounds and was almost 5-feet, 10-inches. [ECF No. 184, pp. 73–74:24–2].

4.      On May 18, Plaintiff and her daughter spent part of the day ashore in Nassau, The Bahamas. [ECF No. 184, pp. 45–47:22–19].

5.      On their return to the vessel, Plaintiff and her daughter were walking behind a couple, Johnson and Berry, who were arguing on the pier. The argument went on for several minutes. Johnson charged at Berry, punching her in the head "right in front" of Plaintiff and her daughter. [ECF No. 184, pp. 57–58:9–4, p. 60:13–15]. Plaintiff picked up Berry's glasses from the ground, intending to return them to Berry once they returned to the ship. [ECF No. 184, p. 60:20-23].

6.    Plaintiff was approximately 40 yards, maybe farther, from the *Liberty's* passenger gangway when the incident on the pier occurred. [ECF No. 184, pp. 58–59:21–5].

7.    Plaintiff did not see any port security or Carnival crewmembers near the altercation between Johnson and Berry. The only employees who Ms. Gould said she knows to have seen the altercation worked for MSC Cruise Line. [ECF No. 184, p. 59:7–17].

8.    The altercation occurred near an MSC ship's boarding doors. It was not near any Carnival employees or the *Liberty's* passenger gangway. [ECF No. 184, p. 61:2–3].

9.    Plaintiff did not see Johnson and Berry have a physical altercation until they were in front of the MSC ship. [ECF No. 185, p. 310:2–6].

10.    Plaintiff did not feel in danger on the pier because Johnson and Berry were arguing only between themselves. [ECF No. 184, p. 61:17–22].

11.    After the on-pier altercation, Johnson and Berry continued walking toward the gangway, and Plaintiff followed them with her daughter. A woman in uniform, who appeared to be an MSC crewmember, left the vicinity of the MSC boarding doors and followed Johnson and Berry, as well. [ECF No. 184, p. 61:2–16, p. 62:7–17].

12.     According to Plaintiff, the uniformed woman trailed along after the altercation, eventually passing all four of them (Johnson, Berry, Plaintiff, and her daughter). [ECF No. 185, p. 311:5–13].

13.     Upon entering the gangway line, Plaintiff handed Berry her glasses. Johnson was a step or two in front of Berry at this time. [ECF No. 184, pp. 62–63:18–7].

14.     Plaintiff did not feel any concern for her or her daughter's safety in line because there was "nothing happening." She did not expect Johnson to hit Berry again. In fact, Plaintiff had stopped thinking about Johnson and Berry. Instead, she mentally prepared for an elegant dinner on the ship. [ECF No. 184, p. 63:8–17, p. 100:12–24].

15.     Plaintiff claims that, while in line, she saw the uniformed woman from the MSC ship approach an apparent Carnival employee at the base of the gangway. Plaintiff could not hear their conversation. The woman raised a fist to her own head, and then she pointed toward Johnson and Berry (hereinafter, "the gesture"). [ECF No. 184, pp. 64–66:6–3].

16.     In her deposition, however, Ms. Gould testified that there were *no* crewmembers standing between a structure on the pier and the crewmembers onboard the *Liberty* inside the clamshell door. Plaintiff testified at trial, however, that there was a Carnival crewmember with a white uniform at the base of the

gangway. According to Plaintiff, the MSC employee gestured to this Carnival crewmember. [ECF No. 185, p. 319:14–22, pp. 321–323:13–8].

17.     Plaintiff did not hear the MSC employee say anything to a Carnival employee. [ECF No. 185, p. 318:10–13].

18.     The gesture occurred approximately seven to ten minutes after Johnson and Berry's initial altercation on the pier by the MSC ship's passenger gangway. [ECF No. 184, p. 66:14–20].

19.     On the *Liberty's* gangway ramp, Johnson was a couple of steps in front of Berry, Plaintiff was within an arm's length behind Berry, and A.G. was directly behind Plaintiff. [ECF No. 184, pp. 66–67:21–1, pp. 71–72:22–2; ECF No. 185, p. 313:4–23; ECF No. 186, p. 18:3–18].

20.     Johnson and Berry suddenly started arguing again while on the gangway ramp. [ECF No. 184, pp. 70–71:9–7].

21.     Plaintiff could not see any Carnival Security or other crewmembers from her position on the gangway ramp when Johnson and Berry suddenly began arguing. [ECF No. 184, p. 72:7–9].

22.     The argument quickly became physical. Johnson swung at Berry, who made contact with Plaintiff, causing Plaintiff to fall and strike her head on the pier. [ECF No. 184, pp. 73–74:10–10].

23.     Plaintiff guessed that the gangway altercation was five or six minutes after she saw the alleged gesture from the unidentified MSC employee to the unidentified Carnival employee. No Carnival crewmember intervened during that time. [ECF No. 184, p. 98:1–8; ECF No. 186, pp. 35–36:25–3].

24.     There was no indication that Johnson and Berry were still fighting as they approached and entered the gangway. [ECF No. 185, p. 312:5–17].

25.     Johnson's swing at Berry was sudden. [ECF No. 185, p. 314:17–19].

26.     Plaintiff never expected Johnson to hit Berry on the gangway ramp. [ECF No. 185, p. 317:5–10].

27.     Johnson and Berry were not screaming at each other when their argument resumed on the gangway. The argument may have gone on for a couple of minutes, but Plaintiff is not sure. [ECF No. 186, pp. 18–19:23–9].

28.     Plaintiff felt safe on the gangway before the argument turned violent. [ECF No. 186, pp. 20–21:19–5].

29.     Plaintiff is unsure if, or for how long, she was unconscious, but she testified she could see only blackness and shadows until hearing her daughter cry. [ECF No. 184, pp. 74–76:11–10].

30.     Plaintiff made multiple complaints on the ship regarding her incident and made clear with Defendant that she wanted to press charges. [ECF No. 184 at 77:2-5]. Plaintiff was told charges could be pressed when the ship returned to Florida,

but then told later that Florida had no jurisdiction over the incident. [ECF No. 184 at 78:7-8; 90:11-19; 91:3-17; 92:1-25].

31.     Defendant initially informed Plaintiff that Johnson and Berry would be confined to their cabin, but that did not turn out to be true as Defendant did not detain Johnson or Berry and did not press charges against them in any jurisdiction. [ECF No. 184 at 87:4-9; 88:4-8; 89:4-93:9].

32.     After the cruise, on May 21, 2018, Plaintiff went to Dr. Warren Benton because she had a headache at the base of her neck and top of her head, which Plaintiff attributed to the fall. Her pain was a five on a scale of one to ten, ten being the worst. [ECF No. 185, p. 294:9–21].

33.     Plaintiff saw Dr. Joseph Hartig, Plaintiff's primary care physician, on May 25. He diagnosed Plaintiff with a mild concussion with no loss of consciousness. [ECF No. 185, p. 295:9–20].

34.     In early June, Plaintiff went back to Dr. Hartig, complaining of headaches, dizziness, nausea, blurred vision, back pain, and neck pain. [ECF No. 185, p. 296:11–18].

35.     In July, Plaintiff had a brain MRI, which was normal, and she followed up with Dr. Hartig on July 31, 2018. [ECF No. 185, p. 296:19–21].

36.     During that July 31 visit, Plaintiff disclosed that she went to a rock concert starring Rob Zombie and a few other bands a few weeks earlier. Plaintiff experienced no headache

symptoms or vertigo issues at or after the concert. [ECF No. 185, p. 297:1–14].[3] She said she sat toward the back (even though she normally likes to be up front) and wore earplugs. [ECF No. 185, p. 116:1-18].

37.     In August, Plaintiff explained to Dr. Hartig that her headaches had resolved. She got a tattoo behind her left ear shortly before the visit, which did not hurt. She had a slight headache the day before visiting Dr. Hartig, but it resolved with Advil. During this visit, Plaintiff denied new headaches and blurred vision. [ECF No. 185, pp. 297–298:15–16, p. 299:2–14].

38.     Plaintiff also went to King's Island amusement park for seven hours in August 2018 and did not suffer from a headache. [ECF No. 185, p. 298:2–11].

39.     Plaintiff began seeing Nurse Cathy Kreimer in July 2018. Nurse Kreimer prescribed Topamax for thirty days to treat Plaintiff's migraines. That caused negative side effects, so she then prescribed Trokendi, a time-release version of Topamax. [ECF No. 183, p. 148:17–21; ECF No. 184, pp. 116–117:13–3].

40.     Trokendi was successful. It reduced Plaintiff's migraine days by half in the first month. During her second month with Trokendi (October 2018 to the beginning of November), Plaintiff suffered no headaches or migraines. [ECF No. 184, pp. 125–126:2–4, p. 127:10–21].

---

[3]     Rob Zombie is known for founding the heavy metal group White Zombie. [ECF No. 185, p. 329:23-24].

41.     Because she went so long without suffering from headaches and migraines, Plaintiff returned to work. However, Plaintiff lasted only thirty minutes into her first shift at the blackjack table. Because the slot machines were so bright and loud, her head "started pounding, and that headache didn't go away for over 16 months." [ECF No. 184, p. 128:2–16].

42.     Plaintiff went back to Nurse Kreimer on December 6, 2018. She prescribed Plaintiff a tapered steroid pack. [ECF No. 184, P. 129:12–14].

43.     Nurse Kreimer later prescribed Emgality. The injections reduced the intensity of the migraines,[4] and Plaintiff used those from February or March 2019 through December 2019. However, while helpful, Emgality did not eliminate the migraines. [ECF No. 184, pp. 138–139:16–8].

44.     Plaintiff also underwent cranial sacral therapy, which was ineffective. [ECF No. 183:16–21].

45.     In January 2019, two months after returning to work full-time, Plaintiff went to Dr. Meyers for an assessment of headaches and neck pain which worsened with the headaches, similar to what she suffered from since adolescence. [ECF No. 185, p. 300:2–14].

46.     In April 2019, Dr. Hartig referred Plaintiff to Dr. Jessica MacDonald. Dr. Hartig noted that Plaintiff retained Mr. Aronfeld to file suit against Carnival and that Plaintiff

---

[4]     Emgality is a once-monthly, injection-based medication used to treat and prevent migraines.

started seeing Nurse Kreimer. [ECF No. 185, pp. 300–301:15–6].

47.      In December 2019, Nurse Kreimer suggested Botox. According to Plaintiff, she felt relief during her second round of Botox in March 2020. Now, with regular three-month rounds of Botox, Plaintiff has improved: Plaintiff gets headaches or migraines about five or six times per month, and they subside with Advil. [ECF No. 184, p. 139:9–12, p. 141:12–17, p. 142:12–19].

48.      Plaintiff's Botox injections cost her $1,000 each. [ECF No. 185, p. 246:19–22].

49.      **Plaintiff testified she was never prescribed medication for headaches before the incident on the cruise.** [ECF No. 185, p. 231:5–10].

50.      **Plaintiff denied having bad headaches in previous years**. [ECF No. 185, p. 234:9–13].

51.      Plaintiff **denied having migraines in the past and testified that no doctor had ever diagnosed her with migraines or had prescribed medicine for them.** She stated that she had treated headaches only with Advil, Tylenol, or Excedrin in the past. Plaintiff does not know why Dr. Scott Meyers's medical records at the University of Cincinnati Health indicate that Plaintiff was taking medicine for her long history of migraines that started when she was in her twenties. [ECF No. 184, pp. 109–111:11–10, p. 126:5–25, p. 134:6–22].

51.      In Plaintiff's deposition, she claimed she never had bouts of prolonged

52.      headaches or migraines. She claims she testified that way because she had never before been treated for headaches or migraines. [ECF No. 185, pp. 251–255:2–4].

53.      Plaintiff does not believe her deposition is inaccurate because she does not believe she suffered from headaches in the past. [ECF No. 185, p. 240:4–23].

54.     Plaintiff later testified that her previous medical conditions include lower back surgery, an excision from her breast, a cesarean section, gall bladder removal, high blood pressure, dizziness, <u>headaches</u>, and depression. [ECF No. 184, p. 105:13–19, p. 109:7–10, p. 118:11–13].

55.     Before the cruise, however, it is clear that Plaintiff had headaches and migraines that would last longer than twenty-four hours and occur a few times per month. [ECF No. 185, p. 257:3–13; Def. Ex. 20].

56.     Plaintiff conceded that her medical records indicate that her testimony was untruthful. She agreed that she was not claiming that her medical records are incorrect. Rather, Ms. Gould said she did not remember why she went to the doctor eight years ago. [ECF No. 185, p. 266:2–14].

57.     In the past, Plaintiff has had trouble with sounds and lights, causing headaches and migraines. [ECF No. 185, pp. 260–261:22–21].

58.     In 2009, Plaintiff described frequent moderate headaches that go to the base of her skull and jaw. [ECF No. 185, pp. 262–263:21–6].

59.     Plaintiff suffered from cervical cranial headaches in 2009. She remembers undergoing an x-ray of her neck at that time. [ECF No. 185, p. 245:2–15].

60.     Plaintiff went to Dr. James S. Howell in February 2012, complaining of daily headaches with pain that ranged from six to nine on a scale of ten. [ECF No. 185, p. 259:12–25; Def. Ex. 20].

61.     In 2012, Plaintiff advised Dr. Howell that her headaches were frequent and severe, lasting more than two weeks. [ECF No. 185, p. 264:3–20].

62.     Treatments for the 2012 headaches would sometimes last two to four weeks. [ECF No. 185, pp. 266–267:22–2].

63.     In at least one instance, treatment for headaches and neck pain lasted two and a half months. [ECF No. 185, p. 267:14–24].

64.     In August 2015, almost three years before the cruise, Dr. Hartig diagnosed Plaintiff with photo-sensitive headaches. [ECF No. 185, pp. 269–270:24–18].

65.     Dr. Hartig also noted that Plaintiff was positive for sleep disturbance, nervousness, and anxiety in 2015. [ECF No. 185, p. 270:19–24].

66.     On August 27, 2015, Plaintiff went to St. Elizabeth Healthcare for back pain, depression, and headaches. Her blood pressure was 128/88, which is normal. [ECF No. 185, pp. 233–234:20–5].

67.     On October 20, 2015, Plaintiff went back to the doctor for headaches, dizziness, decreased concentration, agitation, nervousness, and anxiousness. She attributes those symptoms to Cymbalta's side effects. [ECF No. 185, p. 236:13–18].

68.     On January 21, 2016, Plaintiff went to the doctor complaining of chest pain, fatigue, dizziness, and headaches. Her blood pressure was normal (120/80). [ECF No. 185, pp. 238–239:21–11].

69.     In January 2016, Dr. Hartig again noted that Plaintiff presented with dizziness and headaches. [ECF No. 185, pp. 273–274:24–4].

70.     In March 2016, Plaintiff saw Dr. Silvana Obici, a thyroid specialist, for a preventative screening. According to Dr. Obici's notes, while explaining her medical history, Plaintiff disclosed that she suffered from _chronic_ headaches. [ECF No. 185, pp.

274–275:18–25; Def. Ex. 20].

71.     Dr. Obici found Plaintiff was positive for dysphonia, which is sound-caused headaches. Plaintiff was also positive for blurred vision, dizziness, anxiety, nervousness, difficulty sleeping, and depression. [ECF No. 185, p. 276:1–21].

72.     In February 2017, Plaintiff saw Dr. Hartig and again complained of headaches and dizziness. [ECF No. 185, p. 277:11–19, p. 280:14–18; Def. Ex. 13].

73.     In June 2017, Plaintiff went to the emergency room experiencing symptoms of uncontrolled hypertension, including headaches, dizziness, fatigue, and confusion. [ECF No. 185, p. 277:11–19, p. 281:6–13; Def. Ex. 13].

74.     In September 2017, Plaintiff was diagnosed with malignant hypertension with symptoms of headaches and dizziness. [ECF No. 185, p. 278:6–11, p. 281:6–18; Def. Ex. 13].

75.     Since 2009, Plaintiff has consistently experienced migraine headaches that are sensitive to sound and light. [ECF No. 185, p. 282:13–15].

76.     Since 2009, Plaintiff has consistently suffered from blurred vision, difficulty with concentration, sleep difficulties, depression, and anxiety. [ECF No. 185, p. 283:16–23].

77.     But at her deposition, however, Plaintiff testified that she did not suffer from anxiety and was never diagnosed with anxiety. [ECF No. 185, p. 284:12–21].

78.     Plaintiff had depression before the incident. She was prescribed Cymbalta in August 2015, and it was ineffective. [ECF No. 185, pp. 231–232:11–7; Pl. Ex. 84].

79.     Plaintiff's medical records indicate her headaches are likely exacerbated by her discontinuing anti-depressants. [ECF No. 185, p. 15:3–6; Pl. Ex. 84, p. 39].

80.     Dr. MacDonald suggested Plaintiff seek psychological treatment for her mood

disorders. However, Plaintiff has not sought any psychological treatment. [ECF No. 185, p. 303:15–20].

81.     Plaintiff did not get a sleep study done, despite it being recommended by Dr. MacDonald. [ECF No. 185, p. 303:7–14].

82.     Since the incident on the *Liberty*, Plaintiff also never saw a chiropractor for her cervical pain, despite a recommendation from Dr. MacDonald that she do so. [ECF No. 185, pp. 302–303:16–6].

83.     All of Plaintiff's doctors have suggested that she lose weight to help ease headaches and lower her blood pressure. [ECF No. 185, p. 238:3–6].

84.     Dr. Hartig prescribed Adipex, which is a diet pill. Despite it helping to a degree, Plaintiff does not take it. [ECF No. 185, p. 238:7–14].

85.     Plaintiff has consistently failed to take her blood pressure medication despite her malignant hypertension. [ECF No. 185, p. 237:10–16].

86.     Plaintiff conceded that she stopped taking her blood pressure medication because she is a "bad patient." [ECF No. 186, p. 29:14–16].

87.     Plaintiff does not like taking medication. She considers herself a "bad patient" because the only medications she has ever taken as instructed have been prescribed by Nurse Kreimer. [ECF No. 185, p. 237:2–9].

88.     Plaintiff's claimed injuries, in this case, are headaches sensitive to sound and light and migraines caused by the fall on the gangway. But her deposition testimony was that she is not claiming aggravation of pre-existing conditions. [ECF No. 185, p. 285:5–25].

89.     Plaintiff's only claimed injury, in this case, is her lingering headaches. [ECF No.

185, pp. 246–247:23–2, pp. 250–251:24–1].

B.      William Gould testified as follows:

1.      Mr. Gould is Plaintiff's ex-husband. They met in 2007 and have a seven-year-old daughter, A.G. [ECF No. 185, pp. 170–171:3–6].

2.      Mr. Gould was not with Plaintiff at the time of her injury. When Plaintiff and A.G. went swimming at Atlantis in Nassau, he went to the casino. [ECF No. 185, p. 172:1–8].

3.      Mr. Gould guesses that he took the picture of the pier from their stateroom balcony that is Plaintiff's Exhibit 5 approximately forty-five minutes to an hour after he boarded the vessel. [ECF No. 185, pp. 172–174:21–20].

4.      Plaintiff never complained about confusion to Mr. Gould before the gangway incident. [ECF No. 185, p. 178:11–13].

5.      Plaintiff used to go to King's Island amusement park regularly, but now she does not visit there because of the headaches. [ECF No. 185, p. 194:6–13].

6.      Despite being together at the time, it would be surprising to Mr. Gould that Plaintiff went to a doctor in 2008 for cervical strain. [ECF No. 185, p. 201:18–22].

7.      It would be surprising to Mr. Gould that Plaintiff went to a doctor for headaches at the base of her skull in 2009. [ECF No. 185, p. 202:11–15].

8.      Mr. Gould did not know that Plaintiff went to the doctor several times for headaches and neck pain in 2012. [ECF No. 185, p. 203:14–22].

9.      Plaintiff never told Mr. Gould that she was prescribed medication for headaches before the cruise. [ECF No. 185, p. 203:23–25].

10.     Plaintiff never told Mr. Gould that she sought treatment for decreased concentration, blurred vision, headaches, and dizziness before the cruise. [ECF No. 185, p. 204:1–8].

11.     Mr. Gould sees Plaintiff once or twice per week for approximately ten to fifteen minutes. [ECF No. 185, pp. 207–208:24–11].

C.      Plaintiff's minor daughter, A.G., testified as follows:

1.      A.G. is the seven-year-old daughter of Plaintiff. [ECF No. 185, pp. 214–215:16–1].

2.      Plaintiff told A.G. a few days before A.G.'s testimony how often Plaintiff gets headaches, but A.G. cannot remember what Plaintiff told her. [ECF No. 185, p. 219:19–21].

3.      A.G. has seen Plaintiff suffer from headaches a "really small amount[] of times" since the incident. [ECF No. 185, p. 220:9–11].

4.      A.G. did not hear anything loud before Plaintiff fell. All she remembers is that she handed something to her mother, who then fell. [ECF No. 185, p. 216:14–24, p. 222:7–9].

D.     John Butchko, Carnival's corporate representative, testified as follows:

1.     While the *Liberty* was in Nassau on May 18, Carnival had ten Security Officers on duty during the day. [ECF No. 183, p. 52:19–22].

2.     Carnival had no Security Officers patrolling the walkway on the pier between the *Liberty* and the adjacent MSC cruise ship. [ECF No. 183, p. 53:7–18].

3.     Carnival had two active gangways at the time of Plaintiff's incident: a fore gangway and an aft gangway. The fore gangway was for crewmembers, and the aft gangway was for passengers. [ECF No. 183, p. 53:21–23].

4.     Carnival had three Security Officers posted at each gangway's security checkpoint. [ECF No. 183, p. 54:3–11].

5.     Carnival's ship security manual requires constant vigilance against suspicious and unauthorized people entering the clamshell door. (Pl. Ex. 49; ECF No. 183, p. 66:10–13, p. 70:9–19].

6.     The gangway Security Officers are approximately five to ten feet inside the ship, beyond the clamshell door. [ECF No. 183, p. 72:3–6].

7.     Carnival posts the Security Officers a few feet inside the clamshell door to protect against security breaches and unauthorized intrusions, per United States Coast Guard Regulations. [ECF No. 183, p. 54:12–19].

8.     The *Liberty* gangway ramp is approximately fifteen feet long. [ECF No. 183, p. 70:21–23].

9.      Carnival is responsible for ensuring that the gangway ramp is securely connected for safe ingress and egress of passengers and protecting against security breaches. However, the local port authorities are responsible for crime on the pier and any areas beyond the gangway ramp. [ECF No. 183, pp. 63–64:4–24, p. 75:8–14].

10.     Under the ISPS Code in SOLAS (Safety of Life at Seas), Carnival is required to monitor the outside decks onboard its ships. However, the areas surrounding the ship are the responsibility of local port authorities pursuant to Carnival's contractual security plan with the Bahamian Port Authority. [ECF No. 183, pp. 188–192:19–18; Pl. Ex. 122; ECF No. 184, pp. 9–10:25–3].

11.     Carnival does not assign Security Officers to the base of the gangway ramp because that area is under the authority of the port. [ECF No. 183, p. 55:6–13].

12.     The three Security Officers assigned to the aft gangway had duties like x-raying packages, inspecting pocketbooks, and swiping Sign-and-Sail identification cards to verify authorization to board. [ECF No. 183, p. 58:20–25, pp. 70–71:24–1].

13.     Carnival has no knowledge about whether an MSC crewmember told a Carnival crewmember about a violent incident involving Johnson and Berry. [ECF No. 183, p. 59:1–8].

14.     Carnival crewmembers are trained to immediately notify security of any incident. Carnival Security was never notified of a violent incident on the pier involving Johnson and Berry. [ECF No. 183, pp. 59–60, 9–7].

15.     The Security Officers are typically not going to confront someone on the gangway because it is narrow; rather, they are protecting against unauthorized entry, so they stand on guard a few feet inside the ship's clamshell door. [ECF No. 183, p. 72:8–19].

16.     Carnival Security is trained to employ various levels of escalating force, depending on the situation. The first level is one of presence, i.e., a show of force. The second level is verbal confrontation, and the third involves physical removal. [ECF No. 183, pp. 77–78:7–2].

17.     Carnival was unaware that Johnson and Berry had any physical altercation -- either on the pier or on the gangway ramp -- until after Plaintiff was injured. [ECF No. 183, pp. 79–82:14–1].

18.     After realizing Plaintiff was injured, Carnival's top priority was her health and well-being. [ECF No. 183, p. 193:13–19].

19.     Carnival allowed the gangway security checkpoint to stay open, thus permitting Johnson entry, because there was nothing appearing to be a danger to the ship and Johnson had proper authorization. There was no reason to deny him

entry because Carnival had no knowledge that Johnson was a danger. [ECF No. 183, pp. 193–197:13–12].

20.     About five minutes after they were granted entry, Johnson and Berry were escorted from the ship to be interviewed by the Bahamian port authorities. [ECF No. 183, p. 208:8–10, p. 220:2–10].

21.     Johnson and Berry refused to give Carnival a statement. [ECF No. 183, p. 209:11–16].

22.     In situations such as this, Carnival's security manual requires Security Officers to "[e]valuate the situation, see what happened, treat the victim or get people who will also assist in treating the victim." If required under the circumstances, then they notify the port authorities. [ECF No. 183, p. 258:15–25, pp. 259–260:20–2].

23.     Carnival had no Security Officers stationed at the base of the gangway. Their responsibility is inside the clamshell door. [ECF No. 183, p. 260:3–10].

24.     Assuming an MSC employee told a Carnival employee about the initial altercation on the pier, as Plaintiff testified, the proper response would have been to simply evaluate and then proceed from there. [ECF No. 183, pp. 261–262:5–7].

25.     A security watch report contains a Security Officer's summation of what occurred during the shift. In the relevant security watch reports, there is a discussion regarding MSC guests and port authorities speaking with Carnival *after*

the incident. There is also a general discussion about the security department's response to the incident. There is, however, no mention of an MSC crewmember speaking with a Carnival employee about the prior pier incident or making a gesture relating to it. This lack of a written comment suggests that no MSC crewmember discussed the on-pier altercation with a Carnival employee and that no MSC staffer gestured to a Carnival employee about the physical dispute because the Security Officer certainly would have included such an interaction in the written report. [ECF No. 183, pp. 262–264:11–10; Pl. Ex. 27].

26.     The *Liberty* crew and Carnival followed Carnival's security-related policies and procedures on May 18, 2018 and complied with SOLAS. [ECF No. 184, pp. 9–10:25–3].

E.      Richard Ferraro, a Plaintiff-retained expert on maritime safety, testified as follows:

1.      Mr. Ferraro has worked in maritime safety, security, and environmental protection since 1981. For decades, he has applied United States Coast Guard Regulations and international regulations found in SOLAS, including the ISPS Code and ISM Code. [ECF No. 184, pp. 156–158:21–19].[5]

---

[5]     The ISPS (International Ship and Port Facility Security) Code and the ISM (International Safety Management) Code are incorporated into the SOLAS (Safety of Life at Seas) Convention. There are over 160 signatory nations, and about 99% of merchant ships (in terms of gross tonnage) in the world are subject to SOLAS. Together, the ISPS Code, ISM Code, and SOLAS create comprehensive measures for security and define the

2.      The ISM Code prescribes what ships and companies must do for security and overall ship operations. [ECF No. 184, pp. 161–162:20–8].

3.      The ISPS Code in SOLAS is a structured way for companies to develop a security protocol plan and procedure for the entire fleet, including controlling areas around the vessel, which can then be customized for each vessel. [ECF No. 184, p. 163:11–16].

4.      The ISPS Code defines duties and who is responsible for the safety of the ship, passengers, crew, and cargo. [ECF No. 184, p. 228:6–10].

5.      The ISPS Code requires both the ship and the port to have their own respective security plans. [ECF No. 184, pp. 230–231:22–2].

6.      The ISPS Code is the most relevant code in this case because it delves deeply into a shipowner's and port's respective security roles and responsibilities, but the ISM Code has relevance, too. [ECF No. 184, p. 167:2–23].

7.      Sections 7.2, 7.3, and 7.4 of the ISPS Code are relevant for port security. [ECF No. 184, p. 171:6–23].

8.      Carnival complies with the ISPS Code's required procedures by implementing them through a comprehensive ship security plan and a security

---

roles of shipowners, crewmembers, ports, nations, and other relevant parties in security at sea.

24

manual, which are approved and audited by a third party, such as a Recognized Security Organization or an administration of the flag-state of the ship. [ECF No. 184, p. 175:6–11, p. 176:9–16].

9.      Parts of Carnival's security manual are designed to comply with Section 7.2 of the ISPS Code, which is in place to protect "against deliberate acts of theft, harm, terrorism, piracy, or destruction" of a vessel. [ECF No. 184, pp. 174–175:24–5; Pl. Ex. 49].

10.     Sections 4.7.5 and 5.9 of Carnival's security manual are designed to prevent unauthorized persons from boarding the vessel. These satisfy Section 7.2 of the ISPS Code. [ECF No. 184, p. 177:11–13, pp. 178–179:21–2].

11.     Carnival, by way of the ISPS Code, was required to be cognizant of what was happening around the vessel. Mr. Ferraro opines that Carnival was not sufficiently aware, but he reaches that conclusion only because Carnival Security did not see Johnson and Berry's first altercation down the pier, near the MSC ship's boarding doors. [ECF No. 184, pp. 186–188:2–13].

12.     The ISPS Code does not specify what Carnival should have done if it had notice of Johnson and Berry's first altercation; rather, the ISPS Code requires that Carnival adhere to its approved security plan. [ECF No. 184, p. 189:13–20].

13.     Mr. Ferraro has no knowledge to suggest Carnival owned or controlled the pier. [ECF No. 184, p. 215:9–12].

14.     The ISPS Code requires vessels to take action to prevent harm, but it does not specify how. The vessel's security plan should specify the procedure. [ECF No. 184, p. 248:5–18].

15.     Under the ISPS Code, a shipowner and port can agree to delineate responsibilities. This is called a Declaration of Security. [ECF No. 184, p. 220:7–13].

16.     Mr. Ferraro requested a copy of the Declaration of Security from Plaintiff's counsel no fewer than seven times since being retained for this case. However, he never received one. [ECF No. 184, p. 220:14–22].[6]

17.     The *Liberty* had certificates onboard that indicated the vessel was in compliance with SOLAS and the ISM Code. It also had an international ship security certificate. These certificates are regularly audited to confirm compliance. [ECF No. 184, p. 222:12–24].

18.     Mr. Ferraro is not trained to opine on how to handle intoxicated or belligerent individuals. There is no way for Mr. Ferraro to know what Carnival should have done with Johnson in line. It is outside of his expertise to opine on law enforcement matters. [ECF No. 184, pp. 243–244:23–13, pp. 251–252:21–4].

---

[6] There was no request for a "Declaration of Security" or any analogous term in discovery. The term is never mentioned in Mr. Ferraro's report. Its relevance apparently did not arise until trial.

19.     The ISPS Code does not describe things like intoxication or domestic disputes. It basically leaves those open under the responsibility of being situationally aware. [ECF No. 184, p. 181:7–22].

20.     There is nothing specific in Carnival's security plan that indicates it should have pulled the two passengers aside on the gangway (assuming that Carnival had knowledge of Johnson and Berry's first altercation). [ECF No. 184, p. 267:15–25, pp. 269–271:23–2].

21.     Carnival has no duty to monitor passengers when they go into ports of call. [ECF No. 184, p. 257:15–21].

22.     Carnival is not responsible for criminal acts of passengers committed in ports of call, off the ship. [ECF No. 184, p. 256:15–20].

F.     Dr. Jessica MacDonald testified as follows:

1.     Dr. MacDonald is a clinical neuropsychologist who assessed Plaintiff one time, and it was after the incident. [ECF No. 183, pp. 84:8–9, 86–87:23–1].

2.     Dr. MacDonald began her assessment of Plaintiff with an interview regarding her clinical history, the symptoms presented, and the injury. This interview "includes a pretty extensive psychosocial history review [because it is] important for [Dr. MacDonald] to get a good picture of [Plaintiff's] background, both prior to any neurological event and after any neurological event." After the

interview, Plaintiff completed standardized cognitive testing. [ECF No. 183, pp. 87–88:24–16].

3.      Plaintiff did well on cognitive testing, presenting only with mild concentration weakness, which was likely related to her adjustment disorder. An adjustment disorder arises from an "onset of either emotional or behavioral symptoms following an identified stressor." [ECF No. 183, pp. 96–97:23–10, p. 99:16–24].

4.      A neuropsychologist is unable to interpret test results successfully or accurately without the adequate prior medical historical background of a patient. [ECF No. 183, p. 88–89:17–3].

5.      As part of the assessment, Dr. MacDonald must estimate what a patient's pre-existing ability levels are like in order to determine whether the patient's current presentation is consistent with what is expected pre-injury. However, Dr. MacDonald had no prior test results or data to compare Plaintiff's current condition to any pre-existing conditions. [ECF No. 183, pp. 119–120:21–23].

6.      Dr. MacDonald did not review any of Plaintiff's medical records. All of Dr. MacDonald's opinions and impressions were based only on what Plaintiff told her and her testing. [ECF No. 183, p. 109:5–13].

7.      Dr. MacDonald did not know of Plaintiff's 20-year history of migraines. However, that information would have been "very important" to her in

understanding Plaintiff's headaches' symptoms, onset, and timeline. [ECF No. 183, pp. 110–111:10–6].

8.      If Plaintiff told Dr. MacDonald of her long history of migraines, then it is something that she probably would have documented, and it was not documented. [ECF No. 183, pp. 111–112:14–8].

9.      Likewise, it is undocumented that Plaintiff told Dr. MacDonald about her history of severe headaches and dizziness. [ECF No. 183, p. 113:8–12, pp. 114–115:22–3].

10.     Knowledge that a patient has a longstanding history of chronic or frequent headaches, blurred vision, and concentration difficulties would be important for a neuropsychological evaluation focused on cognition. [ECF No. 183, pp. 115–116:20–7].

11.     Plaintiff did report the presence of prior psychological symptoms, including a lifelong presence of anxiety, low self-esteem, panic attacks, anti-depressant medication, and stress related to a divorce. [ECF No. 183, pp. 99–100:25–5].

12.     Notwithstanding Dr. MacDonald's lack of knowledge regarding Plaintiff's prior medical history, her diagnosis was that Plaintiff had fully intact cognitive abilities but was experiencing some mild concentration difficulties. [ECF No. 183, p. 122:1–6].

13.     Plaintiff's concentration difficulties are consistent with a history of chronic migraine headaches. [ECF No. 183, p. 123:1–6].

14.     The most salient concern Dr. MacDonald had about Plaintiff's concentration problem was her emotional status. [ECF No. 183, p. 126:13–20].

15.     Dr. MacDonald ultimately diagnosed Plaintiff with a mild concussion. [ECF No. 183, p. 87:16–20].

16.     The expected recovery time post-concussion is four to twelve weeks, which Plaintiff has exceeded. [ECF No. 183, p. 95:11–22].

17.     Often, a person exceeds standard recovery time because of a comorbidity, such as "a neck strain, cervical injury, vestibular disorder, [or] a preexisting history . . . ." The most common comorbidity is a persistent mood disorder, such as depression, because symptoms experienced due to depression and other mood disorders have a similar presentation to post-concussion syndrome. [ECF No. 183, p. 96:1–12, p. 98:1–20, p. 99:5–15].

18.     For future care, Dr. MacDonald recommended that Plaintiff reemploy previously successful treatments for her headaches, repeat a sleep study to evaluate sleep apnea, start an anti-depressant, and go to cognitive behavioral therapy to treat her depression and anxiety. Dr. MacDonald had no knowledge of the cost of her suggested treatment. [ECF No. 183, pp. 101–102:24–19, p. 105:2–3, p. 124:4–20].

19.     Plaintiff did not struggle to answer Dr. MacDonald's questions during the interview. Plaintiff appeared to be a detailed, complete, and accurate historian. Dr. MacDonald did not suspect that Plaintiff was withholding her complete prior medical history. [ECF No. 183, pp. 117–118:7–1].

20.     Plaintiff told Dr. MacDonald that she was represented by a lawyer and intended to use Dr. MacDonald's report in litigation. [ECF No. 183, p. 118:2–6].

G.     Nurse Cathy Kreimer, who treated Plaintiff post-incident, testified as follows:

21.     Nurse Kreimer is an advanced practice registered nurse practitioner who specializes in adult gerontology and works in neurology. She has been board certified since 2015. [ECF No. 183, pp. 146–147:2–2].

22.     Nurse Kreimer treated Plaintiff's migraines and headaches by administering several pill-form medications (Propranolol, Topamax, Trokendi, Amitriptyline, Sumatriptan, Relpax, and Ubrelvy), a monthly injectable (Emgality), and Botox. [ECF No. 183, p. 150:3–18].

23.     Plaintiff is suffering from migraine headaches. It is evident she is suffering from migraines because she has light sensitivity. [ECF No. 183, pp. 154–155:23–4].

24.     Plaintiff's migraine headaches affect her ability to work and sleep. [ECF No. 183, p. 153:4–6, p. 155:11–12].

25.     Botox is used to treat migraines. [ECF No. 183, p. 175:14–15].

26.     Nurse Kreimer administered six Botox injections to Plaintiff. The first was December 12, 2019, and her second injection was four months later. [ECF No. 183, p. 152:2–9].

27.     Nurse Kreimer's last Botox note indicates Plaintiff had a seventy-percent reduction in headaches. Plaintiff did not begin to derive a tangible benefit from the Botox until her sixth treatment. [ECF No. 183, pp. 180–181:15–2].

28.     Upon beginning to treat a patient, Nurse Kreimer takes past medical history to understand how to treat the patient. [ECF No. 183, p. 167:4–10].

29.     Nurse Kreimer was unaware, however, that Plaintiff suffered from a long history of migraines. But that information would not change her treatment, "[b]ecause you treat the patient for what is in front of you. She has migraine headaches, so [Nurse Kreimer treated Plaintiff] for her migraine headaches." [ECF No. 183, pp. 160–161:22–9].

30.     Plaintiff did not disclose to Nurse Kreimer that she was previously diagnosed with chronic postural cervical strain, which is often associated with headaches, or that she suffered from longstanding headaches of any kind. [ECF No. 183, pp. 165–166:2–20].

31.     During their discussion about Plaintiff's history, Plaintiff did not disclose to Nurse Kreimer that she was previously treated for headaches at the base of her skull. Plaintiff did not disclose that she had moderate and frequent headaches

since her twenties. Plaintiff did not disclose that she sought treatment for daily severe headaches, near-daily migraines, and neck pain in 2012. Plaintiff did not disclose a history of dizziness or that she sought treatment for decreased concentration and agitation in 2015. [ECF No. 183, pp. 167–169:24–10, pp. 170–171:21–2].

32.     Plaintiff disclosed that she suffered from hypertension, but she did not disclose that it was uncontrolled and that she was diagnosed with malignant hypertension in 2017. Headaches, dizziness, lack of concentration, and blurred vision are all symptoms of uncontrolled malignant hypertension. [ECF No. 183, pp. 171–173:19–2].

33.     Plaintiff linked all of her headaches directly to the May 2018 cruise incident. [ECF No. 183, p. 169:8–10].

34.     A nurse practitioner must fully understand the patients' medical history to provide proper treatment, yet Plaintiff did not disclose important information. [ECF No. 183, p. 169:16–24].

35.     Although Nurse Kreimer was aware of Plaintiff's history of depression, which is important because depression and anxiety go hand-in-hand with post-concussion syndrome, she was not told that Cymbalta had been prescribed for Plaintiff. [ECF No. 183, p. 170:10–15].

33

36.     At the time of her evaluation, Nurse Kreimer knew that Plaintiff was pursuing this lawsuit and trying to claim her headaches were posttraumatic from the incident in May 2018. [ECF No. 183, p. 176:19–24].

H.     Plaintiff called Dr. Nicholas Suite as an expert neurologist. He testified as follows:

1.     Dr. Suite has been a board-certified neurologist since 1994. [ECF No. 185, p. 14:7–9].

2.     Dr. Suite charges $900 per hour for testimony and medical examinations and $500 per hour to read records. [ECF No. 185, p. 53:22–23].

3.     A neurologist's assessment is only as good as the information given, especially a patient's subjective history. [ECF No. 185, pp. 73–74:20–13, p. 82:4–6].

4.     Neurologists rely on patients disclosing previous conditions. [ECF No. 185, p. 29:22–24].

5.     When discussing the incident with Dr. Suite, Plaintiff told him that she was suffering from neck pain, low back pain, headaches, dizziness, fatigue, and depression, purportedly because of the injury on the cruise. She reported that she was suffering from depression before the incident, but she did not disclose her other pre-existing conditions, such as headaches and neck pain. [ECF No. 185, p. 28:7–17].

6.     The neck pain is important to the assessment. Straining the neck's muscles can lead to headaches. [ECF No. 185, pp. 28–29:18–13].

7.      Plaintiff did not mention any previous headaches to Dr. Suite, but she did disclose that she suffered a hypertensive emergency before the cruise. [ECF No. 185, pp. 36–37:24–4].

8.      Dr. Suite took Plaintiff's blood pressure during the exam, and it was **220 over 120** and then 180 over 100. This level has potentially damaging effects. [ECF No. 185, pp. 33–34:14–2].

9.      Changes in blood pressure, among many other things, can lead to headaches and dizziness. Therefore, there is "a big differential diagnosis" in evaluating these symptoms because of Plaintiff's uncontrolled hypertension. [ECF No. 185, pp. 30–31:3–3].

10.     Many things can cause elevated blood pressure. Plaintiff weighs more than 300 pounds, which puts her at a heightened risk for hypertension. Notably, she has been treated for hypertension for some time. [ECF No. 185, pp. 34–35:16–7].

11.     Hypertension can cause headaches, dizziness, depression, nausea, fatigue, memory issues, and concentration difficulties, especially if the hypertension is uncontrolled, as Plaintiff's hypertension was during her examination with Dr. Suite. [ECF No. 185, pp. 35–36:10–16].

12.     To determine what symptoms -- headaches, dizziness, depression, nausea, fatigue, difficulty with memory and concentration -- can be attributed to the incident, as opposed to pre-existing hypertension, neurologists must obtain a

sense of what the symptoms were like before the concussion compared to after the concussion. Plaintiff was likely previously suffering from mixed-headache (or multifactorial) syndrome, meaning some symptoms can be attributed to causes other than concussion. [ECF No. 185, pp. 37–38:11–15].

13.     It is important to review prior medical records and previous medications to understand what aspects of the headaches are attributed to the concussion. [ECF No. 185, pp. 38–39:16–13].

14.     Dr. Suite never reviewed Plaintiff's pre-cruise medical records, nor did he ask Plaintiff's counsel for her pre-cruise medical records because he thought he had sufficient information to understand her pre-existing conditions. [ECF No. 185, p. 133:2–10].

15.     Dr. Suite reviewed Plaintiff's medical records only from after the cruise. He reviewed no records from before May 2018 despite those records being important for rendering a differential diagnosis. [ECF No. 185, p. 81:1–8].

16.     Dr. Suite did not review any depositions. [ECF No. 185, p. 98:9–13].

17.     Dr. Suite never examined records from Oak Hills Back & Neck, Crittenden Primary Care, the University of Cincinnati Medical Center, or any pre-cruise records from St. Elizabeth Healthcare. [ECF No. 185, pp. 82–83:16–19].

18.     On February 16, 2012, Plaintiff presented to Oak Hill's Back & Neck with neck pain and headaches for two weeks. These symptoms are similar to what Dr. Suite sees Plaintiff suffering from now. [ECF No. 185, p. 105:10–16; Def. Ex. 12].

19.     In October 2015, Plaintiff presented to St. Elizabeth's with difficulty concentrating, anxiety, depression, insomnia, racing thoughts, dizziness, and headaches, which onset seven months before and gradually worsened. These are some of the same symptoms that she reported during her exam with Dr. Suite and are consistent with the symptoms she reported were caused by the fall. [ECF No. 185, pp. 107–108:1–9; Def. Ex. 13].

20.     Plaintiff's longstanding depression can cause memory loss, memory inability, or headaches. [ECF No. 185, p. 101:9–18].

21.     Sleep apnea can create or aggravate these types of headaches that Plaintiff is currently suffering from. Plaintiff is at a great risk of sleep apnea because of her weight. [ECF No. 185, p. 134:5–21].

22.     If Plaintiff lost weight, then it would help her headaches. [ECF No. 185, p. 117:10–21].

23.     Dr. Suite made two suggestions about Plaintiff's medical condition. First, he suggested she obtain a brain MRI. Second, he suggested she control her hypertension. He did not suggest following up with another neuropsychologist or to take any medication, including Botox. [ECF No. 185, pp. 94–95:18–2].

24.     Botox does not affect the blood vessels in the brain; it affects the muscles that support the head. [ECF No. 185, pp. 94–95:18–2].

25.     Dr. Suite does not believe Plaintiff is currently suffering from migraines, but he believes this only because of his belief that she failed to respond to migraine treatment. [ECF No. 185, p. 42:3–13].

26.     If Plaintiff positively responded to migraine medication, then Dr. Suite would agree that her current headaches were migraine-related, which would mean her headaches were not caused by the fall. [ECF No. 185, pp. 136–137:10–2].

27.     Dr. Suite opines that Plaintiff has eleven conditions relating to her headaches. Some are causally related to the incident on the gangway, while other conditions, such as hypertension and herniated discs, were pre-existing. [ECF No. 185, pp. 43–44:17–13, pp. 66–67:4–12].

28.     Dr. Suite does not want "to hang everything on the fall." It may have played a role in Plaintiff's headaches, but her weight and blood pressure are crucial considerations. [ECF No. 185, p. 55:11–22].

29.     Hypertension cannot be ruled out as a differential diagnosis for Plaintiff's post-incident headaches. [ECF No. 185, p. 90:3–8].

<u>Defendant's Case</u>

A.      James Anthony Cruz, the Chief Security Officer onboard the *Liberty* in May 2018,

testified as follows:

1.      Mr. Cruz has worked for Carnival for 22 years. He started as a Security

Officer, and then he was promoted to Assistant Chief Security Officer. Seven years

later, he was promoted to Chief Security Officer. [ECF No. 186, p. 67:14–22].

2.      Mr. Cruz was the Chief Security Officer onboard the *Liberty* during May

2018. [ECF No. 186, p. 68:8–10].

3.      Security Officers are stationed at the gangway security checkpoint near the

x-ray machine. Carnival does not position Security Officers outside the clamshell

door or at the base of the gangway ramp. [ECF No. 186, p. 70:2–19, p. 74:13–17].

4.      The person pictured at the base of the gangway ramp in Plaintiff's Exhibit

5 is not a Security Officer based on the uniform. [ECF No. 186, pp. 78–79:23–3].

5.      There were three Security Officers positioned at the gangway security

checkpoint. Their responsibility was to ensure that only authorized persons came

onboard and to x-ray belongings to prevent contraband. [ECF No. 186, p. 90:5–18].

6.      Carnival does not have Security Officers walking around the pier. [ECF No.

186, p. 71:5–14].

7.      It is not Mr. Cruz's decision where to place Security Officers. They were

positioned in accordance with Carnival's security plan. [ECF No. 186, p. 92:9–23].

8.      Because the gangway is narrow, Carnival would intervene on the gangway ramp only if a passenger posed a threat to other passengers or property. [ECF No. 186, p. 77:2–15].

9.      David Johnson, the Guest Services Manager, first notified Mr. Cruz that Plaintiff was injured at 5:36 PM. [ECF No. 186, p. 110:21–24].

10.     Plaintiff was conscious but bleeding slightly when Mr. Cruz arrived on the scene. [ECF No. 186, p. 100:21–25].

11.     It was not until after the incident that Carnival knew that. Johnson and Berry were involved in an altercation. [ECF No. 186, p. 114:20–24].

12.     The Bahamian Port Authority interrogated Johnson and Berry before they were allowed to return to the ship. [ECF No. 186, pp. 116–117:9–18].

13.     Mr. Cruz felt it was appropriate to allow Johnson and Berry to return onboard because there was no physical injury to Berry, they did not pose a threat to others, and they were authorized passengers. [ECF No. 186, p. 123:1–5].

14.     Mr. Cruz saw no crewmembers at the base of the gangway when he found Plaintiff. [ECF No. 186, pp. 136–137:25–6].

B.      Debbie Smith, a former Carnival passenger, testified as follows:

1.      Ms. Smith was a passenger onboard the *Liberty* in May 2018. She spent part of May 18 ashore in Nassau. [ECF No. 186, p. 142:12–24].

2.      . [ECF No. 186, pp. 145–146:23–19].

3.      Ms. Smith does not recall seeing any Carnival crewmembers on the pier or at the base of the gangway. [ECF No. 186, p. 143:10–20].

4.      Ms. Smith did not see a crewmember from a different cruise line go up to the Carnival gangway or make a gesture to anyone near the gangway. [ECF No. 186, pp. 143–144:23–3].

5.      While on the gangway ramp, Ms. Smith saw a couple arguing behind her. Then, the man lunged at the woman. The woman moved back and knocked Plaintiff off the gangway and onto the ground. [ECF No. 186, p. 144:4–10].

6.      Ms. Smith remembers Plaintiff being conscious after the fall. [ECF No. 186, p. 153:1–3].

7.      Ms. Smith was about midway up the gangway at the time of the incident. There were one or two people between Ms. Smith and the couple. [ECF No. 186, p. 144:14–19].

8.      The couple were bickering (not yelling) for less than a minute before the lunge. [ECF No. 186, pp. 144–145:23–11].

9.      Ms. Smith was on the gangway for a minute or two before noticing them bickering. [ECF No. 186, p. 145:18–22].

10.     Ms. Smith had a clear view of the couple while they were bickering. [ECF No. 186, p. 148:11–16].

11.     Based on Ms. Smith's observation and belief, there was not anything Carnival could have done to prevent Plaintiff's fall. It happened too quickly. The couple was simply bickering before it happened, and the cruise line cannot reasonably tell a couple to stop arguing.

C     Dr. Kenneth C. Fischer, a neurologist, testified as follows:

1.     Dr. Fischer is a triple-board-certified neurologist with forty-six years of experience. He received his M.D. with honors from the Duke University School of Medicine. He was a neurology resident at the University of Miami in 1975, and then he was immediately hired as a full-time faculty member for the University of Miami School of Medicine. He became board certified in neurology in 1978. Ten years later, he was board certified by the American Board of Quality Assurance and Utilization Review, and then he was board certified by the American Academy of Pain Management in 1992. [ECF No. 186, pp. 158–159:2–1].

2.     Dr. Fischer acts as an expert witness for both plaintiffs and defendants. In fact, he is currently involved in several cases against Carnival and its counsel's law firm. [ECF No. 186, pp. 160–161:22–6].

3.     Plaintiff's physical examination was normal in all respects. [ECF No. 186, p. 168:10–12].

4.     Plaintiff's written neuropsychological examination had a perfect score. [ECF No. 186, p. 169:10–12].

5.     During Dr. Fischer's examination of Plaintiff's medical records, Dr. Fischer noted

that Plaintiff suffered from headaches on and off since adolescence. Some headaches were aggravated by external factors, such as weather, allergies, physical trauma, illnesses, and failing to take required medication. Dr. Hartig has prescribed 800 milligrams of ibuprofen to Plaintiff in the past for headaches. [ECF No. 186, pp. 162–163:21–24, p. 189:1–12].

6.      During his exam of Plaintiff, Dr. Fischer spent thirty minutes discussing her medical history with her. Plaintiff, however, did not verbally disclose any of her history relating to headaches during the examination. [ECF No. 186, p. 175:8–12, p. 201:21–25].

7.      Dr. Fischer reviewed the two expert reports submitted by Dr. Suite. In the medical history section of Dr. Suite's reports, Dr. Fischer saw no mention of Plaintiff's previous headaches. [ECF No. 186, pp. 161–162:21–4].

8.      Having Plaintiff's prior medical history is very important and gives him a substantial advantage over Dr. Suite in assessing Plaintiff. [ECF No. 186, pp. 200–201:21–4].

9.      Plaintiff had a history of not taking prescribed medications for her hypertension and thyroid issues before the cruise incident. After the incident, Plaintiff failed to take Topamax, which is used to prevent recurrent migraines, among other things. [ECF No. 186, p. 165:3–25].

10.      Plaintiff's history of not taking her hypertension medication could engender more headaches and migraines, especially since she suffers from uncontrolled hypertension. [ECF No. 186, pp. 163–164:24–21].

11.      Plaintiff's recent headaches, which stopped and then returned more than a month later, are inconsistent with posttraumatic headache syndrome. Instead, Plaintiff's

explanation that she felt great for an extended period after the incident is typical and more consistent with "a short-lived, mild traumatic head injury" or a mild concussion. [ECF No. 186, pp. 166–167:2–1].

12.     Plaintiff's headaches are related to her longstanding conditions, not trauma from the fall. She suffered a mild head injury from the fall, but she suffered no focal neurological disturbance. Her CT scan and brain MRI were normal. The most reasonable conclusion is that her current headaches are not related to the fall because Plaintiff stopped feeling headaches for an extended period. Her unrelenting hypertension, emotional distress, and antecedent migraines are consistent with a longstanding headache condition. [ECF No. 186, pp. 171–174:15–2].

13.     Plaintiff does not have a continuing disability from a neurological perspective. She may be disabled from a psychiatric perspective, but that is beyond Dr. Fischer's expertise. [ECF No. 186, p. 175–176:22–3].

14.     Plaintiff's mental state difficulties are not organically based, according to Dr. MacDonald. Rather, they are due to emotional stress, like anxiety or depression. Dr. MacDonald hoped to mitigate that with "certain interventions." If Plaintiff did not follow through with those interventions, then her mental state would still be affected. [ECF No. 186, p. 170:3–25].

15.     It makes sense to prescribe Plaintiff Duloxetine and other depression medication because depression and adjustment disorders can cause psychosomatic symptoms, like headaches. Treating the underlying disorders would eliminate or improve headache symptoms. [ECF No. 186, p. 199:2–18].

16.     Duloxetine, which Plaintiff has been prescribed in the past, is very commonly used for pain symptoms of migraines. [ECF No. 186, p. 191:8–14].

17.     If Plaintiff took the depression medications that were recommended, such as Prozac and Cymbalta, then she would most likely improve her headache symptomology substantially. [ECF No. 186, pp. 199–200:19–12].

18.     From an anatomic neurological perspective, Plaintiff has no permanent disability. However, this does not consider her morbid obesity or uncontrolled hypertension. [ECF No. 186, p. 176:9–14].

19.     Plaintiff may have continuing headaches, but those would be attributable to a longstanding endogenous headache syndrome that she has had since adolescence. With stress, hypertension, and obesity, those headaches can worsen and become more frequent. [ECF No. 186, pp. 176–177:20–5].

20.     Plaintiff was prescribed Trokendi or Topamax only after the fall. Those treat migraines. Their success indicates Plaintiff is currently suffering from migraines. [ECF No. 186, p. 197:11–23].

21.     Dr. Sullivan's notes indicate Plaintiff had headaches from the fall for about two months. Dr. Fischer agrees that those headaches were posttraumatic from the fall and that they subsequently resolved. Now, she is suffering from the same headaches that she has had since adolescence. [ECF No. 186, pp. 196–197:18–6].

## III.     Applicable Legal Principles

General maritime law applies in cases that allege negligence relating to cruise travel in foreign ports of call. *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1336 (11th Cir.

45

2012). This lawsuit, therefore, falls under general maritime law because it involves alleged negligence in a foreign port of call while Plaintiff was a cruise ship passenger. *Ridley v. NCL (Bahamas) Ltd.*, 824 F. Supp. 2d 1355, 1359 n.4 (S.D. Fla. Oct. 13, 2010) ("[T]here is no doubt that allegations involving negligence aboard a cruise ship — whether docked or otherwise — are controlled by admiralty law.").

To establish negligence, Plaintiff has the burden to prove: (1) Carnival had a duty to protect Plaintiff from a particular hazard; (2) Carnival breached that duty; (3) Carnival's breach actually and proximately caused Plaintiff's injury; and (4) Plaintiff suffered actual harm. *See Chaparro*, 693 F.3d at 1336. That a passenger becomes injured does not give rise to a presumption that an unreasonable danger existed. *See Isbell v. Carnival Corp.*, 462 F. Supp. 2d 1232, 1237 (S.D. Fla. 2006). Rather, there must be some failure to exercise due care before liability can be imposed, as it is well established that a cruise ship operator like Carnival is not liable to passengers as an insurer. *See Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1334 (11th Cir. 1984) ("A carrier by sea, however, is not liable to passengers as an insurer, but only for its negligence.").

A cruise ship operator owes its passengers "the duty of exercising reasonable care under the circumstances of each case." *Torres v. Carnival Corp.*, 635 F. App'x 595, 600–01 (11th Cir. 2015) (quoting *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 632 (1959)). This standard of care "requires, as a prerequisite to imposing liability, that the

carrier have had actual or constructive notice of the risk-creating condition." *Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1322 (11th Cir. 1989).

    i.   <u>Notice</u>

    Plaintiff must prove Carnival knew or should have known there was a non-obvious risk-creating condition. *Carroll v. Carnival Corp.*, 955 F.3d 1260, 1264 (11th Cir. 2020). Without evidence that Carnival had actual or constructive notice of the risk-creating condition and had sufficient time to remedy the condition, direct liability cannot arise as a matter of law. *See, e.g., Yusko v. NCL (Bahamas) Ltd.*, __ F.4th __, No. 20-10452, 2021 WL 2908568, (11th Cir. July 12, 2021) (affirming notice is required for direct negligence claims against cruise lines but is not required for vicarious liability claims arising from the negligence of cruise line employees or agents); *Salazar v. Norwegian Cruise Line Holdings*, 188 F. Supp. 3d 1312, 1318 (S.D. Fla. 2016) ("[Plaintiff] has adduced no evidence to establish that the risk-creating condition existed long enough to put Norwegian on notice of its existence and to allow it the opportunity to remedy the condition."); *Cohen v. Carnival Corp.*, 945 F. Supp. 2d 1351, 1355 (S.D. Fla. 2013) (citing *Smolnikar v. Royal Caribbean Cruises, Ltd.*, 787 F. Supp. 2d 1308, 1323–24 (S.D. Fla. 2011)) (finding Carnival had no actual or constructive notice of any risk-creating condition arising from the gangplank because "there is no evidence in the record that Carnival knew or should have known that the gangplank, steps at the end of the gangplank, and/or the disembarkation process posed any risk-creating condition for any passenger.").

ii.   Duty of Reasonable Care Past the Point of Debarkation

Once a passenger passes the gangway, a cruise line's "only duty [is] to warn passengers of the 'known dangers' which existed 'beyond the point of debarkation in places where passengers are invited reasonably expected to visit'" and that are not apparent to reasonable people. *Lipkin v. Norwegian Cruise Line, Ltd.*, 93 F. Supp. 3d 1311, 1324 (S.D. Fla. 2015) (quoting *Chaparro*, 693 F.3d at 1336); *see also Kadylak v. Royal Caribbean Cruise, Ltd.*, 167 F. Supp. 3d 1301, 1309 (S.D. Fla. 2016) (citing *Chaparro*, 693 F.3d at 1336) ("[O]nce the passenger leaves the ship, the cruise line only 'owes its passengers a duty to warn of known dangers beyond the point of debarkation . . . .'").

*Mills v. NCL (Bahamas) Ltd.* is on-point as to this duty. No. 13-24174-CIV, 2015 WL 11201209 (S.D. Fla. Apr. 10, 2015) (Lenard, J.). The plaintiff in *Mills* was returning to the cruise ship after spending a day in St. Maarten. *Id.* at *3. "On her way back to board the ship, while walking on the pier but before reaching the gangway," a rope that tied the ship to the pier struck the plaintiff from behind. *Id.* at *3. Because the accident occurred "off-ship" on the pier, the cruise line's duty was only to warn of known dangers, so the court granted summary judgment on all claims that were not based on a failure to warn. *Id.* at *6.

*Lipkin* is also instructive on this issue. *See generally* 93 F. Supp. 3d 1311 (S.D. Fla. 2015). After conclusion of a cruise, Lipkin entered a moving walkway in the terminal behind a woman in a wheelchair. *Id.* at 1316. The wheelchair became stuck at the end of

the walkway. *Id.* As the line bottlenecked at the exit, an unknown woman collided with Lipkin, which caused him to fall and break his hip. *Id.* Lipkin sued the cruise line for allowing people to use wheelchairs on the walkway, failing to warn, and negligent maintenance of the walkway. *Id.*

In granting summary judgment, the *Lipkin* Court emphasized that, "because [the plaintiff's] injury occurred off the ship at the terminal, [the cruise line's] **only** duty was to warn passengers of the known dangers . . . ." *Id.* at 1324 (emphasis added). The negligent maintenance claims, therefore, failed for lack of duty. *Id.* at 1325; *see also Carlisle v. Ulysses Line Ltd., S.A.*, 475 So. 2d 248, 251 (Fla. 3d DCA 1985) (deciding issue as one of first impression) ("In extending a cruise ship's duty to its passengers beyond the port, we also circumscribe the duty. . . . That duty, which is to warn, encompasses only dangers of which the carrier knows, or reasonably should have known."), *adopted in Chaparro*, 693 F.3d at 1336 ("It is true that federal courts are not bound by a Florida state court's admiralty decision, but the rule in *Carlisle* is consonant with the federal maritime standard of ordinary reasonable care under the circumstances.") (citations omitted).

The negligent maintenance claims in *Lipkin* were futile because the incident occurred in the terminal, which means that only the failure-to-warn claim was feasible. *See Lipkin*, 93 F. Supp. 3d at 1324.

iii.  Open and Obvious

Carnival's duty to warn is further limited to warning only of conditions that are

not open and apparent to passengers. *See Carroll*, 955 F.3d at 1267 ("The open and obvious nature of a dangerous condition negates liability for failure to warn."). This is because, as a matter of law, Carnival can rely on its passengers using their ordinary senses to protect themselves. *See Luby v. Carnival Cruise Lines, Inc.*, 633 F. Supp. 40, 42 (S.D. Fla. 1986) ("[D]efendant is entitled to expect, as a matter of law, that [the plaintiff] would perceive that which would be obvious to her upon the ordinary use of her senses.").

However, the absence of a duty to warn (because the dangerous condition was open and obvious) is not "a total bar to recovery." *Belik v. Carlson Travel Grp., Inc.*, 864 F. Supp. 2d 1302, 1309 (S.D. Fla. 2011). The open and obvious nature of a risk does not preclude a negligent maintenance claim. Instead, the Eleventh Circuit has adopted the Restatement (Third) of Torts, providing that the "open and obvious nature of a dangerous condition [i]s a factor to be considered in a comparative fault analysis -- not as a bar to liability for negligently maintaining premises." *Carroll*, 955 F.3d at 1268.

As explained in *Carroll*, a cruise ship operator "may still be liable for maintaining a dangerous condition even if the danger was obvious." *Id.* at 1267 (emphasis added) (deciding issue as one of first impression). However, whether a dangerous condition is open and obvious can mitigate -- or even eliminate -- damages when evaluating a plaintiff's comparative fault. *See id.* at 1268–69.

iv.   Proximate Cause

A plaintiff must prove the cruise line's breach of duty proximately caused the

claimed injuries. Again, *Lipkin* provides guidance. The plaintiff in *Lipkin* alleged failure to warn, but he did not offer evidence supporting that "had the [cruise line] adequately discharged its duty to warn of the dangers of wheelchairs on walkways, Plaintiff would not have stepped onto the walkway behind the unknown elderly woman pushing the wheelchair." 93 F. Supp. 3d at 1324. Without evidence to support an allegation that the cruise line's actions or omissions were an actual and proximate cause of the plaintiff's injuries, a negligence claim cannot survive.

This proximate cause issue arose in *Lucas v. Royal Caribbean Cruises, Ltd.*, No. 19-20914-CIV-Scola, 2020 WL 3507634 (S.D. Fla. June 1, 2020), *appeal docketed*, No. 20-13702, (11th Cir. Sep. 30, 2020). Lucas was injured after colliding with a backward skater on an ice rink. *Id.* She alleged the cruise line was negligent for failing to warn of the dangers associated with backward skating and failing to prevent the skater from traveling backward. *Id.*

After a bench trial, the court found there was no duty to warn of or prevent backward skating because its dangers are open and obvious. *Id.* But assuming, *arguendo*, there was a duty to warn, intervene, or admonish backward skating, "no credible evidence was presented to show that, had [the cruise line's] staff previously warned the backwards skater, he would not have resumed skating backwards, regardless, after being admonished not to." *Id.*; *see also* Order Denying Motion for New Trial, 2020 WL 5215407 (S.D. Fla. Sep. 1, 2020) ("[E]ven if there should have been such a policy [to prevent

backwards skating], Lucas provides no facts to support her cursory conclusion that warning the male skater not to skate backward would have stopped him from thereafter skating backward for the rest of the skate session. . . . Without the [backward] skater's testimony, it is nearly impossible for Lucas to show proximate cause.").

## IV.    The Court's Findings and Conclusions

I make the following Findings of Fact and Conclusions of Law:

<u>Findings of Fact</u>

## 1.    Plaintiff's Credibility Challenges

Plaintiff is inconsistent about her medical history and how the events transpired. She testified on multiple occasions that she has not suffered from bad headaches or migraines in the past. Similarly, she said she was never prescribed medicine or treated for headaches. However, Carnival presented medical records from numerous sources that indicate Plaintiff has suffered from significant and lengthy headaches and migraines since adolescence. Eventually, after effective impeachment, [ECF No. 185, p. 254:20], even Plaintiff conceded that her medical records indicate that she was being untruthful.

## 2.    No Carnival Crewmember Was at the Base of the Gangway, Nor was one Required

Ms. Smith testified in deposition and at trial that she did not recall seeing a Carnival crewmember at the base of the gangway. Plaintiff's deposition testimony accords with Ms. Smith's version. Initially, Plaintiff testified that there were some

Security Officers under a reception tent on the pier, but there was no crewmember between the reception tent and the clamshell door. If there was a crewmember at the base of the gangway, then Plaintiff should have answered that question in the affirmative when asked at her deposition. She did not. She did not testify that a crewmember was stationed at the base of the gangway until she was at trial.

According to Mr. Cruz and Mr. Butchko, Carnival does not position security members at the base of the gangway. The *Liberty*'s security plan and the ISPS Code are designed to protect against unauthorized persons and contraband. Carnival accomplishes those goals by placing three Security Officers at the gangway security checkpoint with x-ray machines, metal detectors, and identification verification machines. Carnival did not breach a legal duty of care by not having a crewmember at the base of the gangway; it was adhering to its security plan, which has been approved, audited, and certified by authorities pursuant to the ISPS Code.

Plaintiff's credibility problems, Smith's testimony, and Carnival's security plan, as described by Mr. Ferraro, Mr. Cruz, and Mr. Butchko, lead me to find that there was no crewmember at the base of the gangway. Phrased differently, Ms. Gould has not convinced me by a preponderance of the evidence that a Carnival crewmember was at the gangway base.

### 3.    Plaintiff Has Not Proven that the Gesture Occurred

Because no crewmember was at the base of the gangway, the gesture Plaintiff

testified about could not have happened as Plaintiff testified at trial. Plaintiff is the **only** person to testify about the gesture. Ms. Smith did not recall seeing a Carnival crewmember or someone who could be an MSC crewmember at the base of the gangway, nor did she see a gesture from one crewmember to another. I find Ms. Smith's testimony is more persuasive, given Plaintiff's inconsistencies and credibility challenges. Moreover, unlike Plaintiff, Ms. Smith is unbiased and has no interest in the outcome of this matter.

Carnival Security's watch reports would reflect that there was a gesture if one occurred, but no gesture is found in the reports. Further, it is reasonable to conclude that the purported MSC crewmember, if she exists, would give a statement, as well, given that she allegedly followed Johnson and Berry to the gangway and likely witnessed the incident. But there is no statement in the security watch reports about an MSC crewmember gesturing. This is despite the security watch reports referencing post-incident conversations with MSC passengers and the Bahamian Port Authority. The absence of any mention in the watch reports further supports my finding that the pre-incident gesture never occurred.

In other words, Plaintiff has not established by a preponderance of the evidence that the so-called gesture actually happened.

But even if Plaintiff adequately demonstrated that the gesture occurred (which she has not), I find this fact to be insufficient to establish that Carnival had notice that Johnson was himself a risk-creating condition while on the gangway ramp.

The gesture could have multiple meanings. The testimony is unreliable. It arises only from a plaintiff-witness who lacks credibility. Without corroborating evidence that the gesture means what Plaintiff wants it to mean—i.e., that Carnival had notice that Johnson was a risk-creating condition by virtue of the previous altercation—there must be more for me to find Carnival had notice. I cannot conclude that Carnival had a duty to remedy a purported risk-creating condition based solely on a claimed gesture from a biased source lacking credibility.

**4.      The Bickering Lasted for Less Than a Minute, and It was Not Yelling**

Ms. Smith testified that the bickering went on for less than a minute before Johnson became violent. Ms. Smith emphasized that Johnson and Berry were not yelling at each other, which Plaintiff corroborated. Plaintiff, however, indicated that the bickering lasted a minute or two, but she was guessing about the time period. Accordingly, I find Ms. Smith's version is more convincing, meaning I find that the bickering lasted for less than a minute without yelling.

**5.      Johnson was Not a Foreseeable Risk-Creating Condition to Plaintiff**

Both Plaintiff and Ms. Smith indicated that they felt safe around Johnson and Berry while on the gangway ramp. Plaintiff testified that several minutes elapsed since the first altercation and that Johnson and Berry both seemed calm in line. Plaintiff actually stopped thinking about Johnson and Berry to focus on her daughter and an elegant dinner on the ship.

Ms. Smith likened the bickering to a run-of-the-mill back-and-forth conversation between a married couple, which she occasionally engages in with her husband. Accordingly, she did not feel as if she was in danger even when they were bickering. Based on the fact that Ms. Smith and Plaintiff felt safe while the bickering was ongoing, I conclude that Johnson was not a risk-creating condition at any time on the gangway ramp, including during the bickering.

Hypothetically, if Johnson was a risk-creating condition while bickering, it was not foreseeable to Carnival that he posed a risk to Plaintiff. Plaintiff's testimony that she could not see any Carnival crewmembers from her position on the gangway ramp corroborates this finding of a lack of foreseeability. From their positions inside the ship, the Carnival Security Officers likely did not hear any bickering (since Johnson and Berry were not yelling) or see anything to indicate imminent violence.

Plaintiff offers no evidence to support a contrary conclusion. At worst, it would be foreseeable that *Berry* was at risk. I find that, even once the bickering started, it was not foreseeable to Carnival that (1) Johnson would lunge at Berry, (2) Berry would dodge that lunge, and (3) Berry would fall into Plaintiff and cause her to fall off the gangway.

In sum, I find Johnson was not a risk-creating condition, either before or during the bickering. However, even if he was a risk-creating condition of which Carnival had notice, the risk that was hypothetically foreseeable to Carnival concerned a risk only to Berry. Carnival could not reasonably foresee that Plaintiff was in danger before she fell.

**6.**     **If Johnson was a Foreseeable Risk-Creating Condition, Then Plaintiff Knew or Should Have Known of that Risk Because It was Open and Obvious to Her**

Plaintiff had *actual* knowledge of Johnson's violence toward Berry on the pier because she personally witnessed Johnson punch Berry after watching them argue on the pier. Then, Plaintiff followed them for several minutes, entered the gangway behind them, handed Berry her sunglasses, stood within an arm's length distance of Berry for several minutes, and did nothing to protect herself or her daughter, either before or after the bickering started.

According to Plaintiff, between seven and ten minutes elapsed from the first altercation to her fall. Plaintiff, thus, had significant time and opportunity to avoid Johnson and Berry or initiate protective measures. But she did nothing. Instead, she thought about an elegant dinner on the ship while waiting in line behind Johnson and Berry.

Earlier in this Order, I found that Johnson was not a foreseeable risk-creating condition to Plaintiff on the gangway ramp; however, if he was a risk-creating condition to her, then that risk was open and obvious to Plaintiff through ordinary reasonable use of her senses and actual knowledge.

**7.**     **Intervention by Carnival Would Not Have Prevented Plaintiff's Fall**

I find Johnson would not have heeded a warning or admonishment if Carnival intervened. He punched his girlfriend in front of an audience on the pier, and then tried to do it again on the gangway ramp. This indicates he did not care about public

perception, legal consequences, or warnings from Carnival. It is possible that a warning from Carnival on the gangway could have enraged Johnson further, given his erratic temperament, which would have put Plaintiff and other guests at a *heightened* risk on the narrow gangway.

Relatedly, Mr. Butchko and Mr. Cruz testified that Security Officers are directed to err toward not initiating physical altercation on the gangway because it is narrow. They will not physically intervene unless absolutely necessary to prevent harm to persons or property. This is a reasonable policy, as it is designed with passengers' safety in mind, and it has been audited and approved by authorities under the ISPS Code. A verbal altercation, such as the on-the-gangway bickering between Johnson and Berry, does not rise to the level required to necessitate physical intervention on a narrow gangway.

Plaintiff presents no evidence to meet her burden on the issue of effective intervention, as Mr. Ferraro conceded he is unqualified in law enforcement. Based on the limited relevant evidence, I find that an intervention, warning, or admonishment to Mr. Johnson would have been ineffective at preventing Plaintiff's injuries and could have placed other passengers in danger.

**8.  If Johnson was a Risk-Creating Condition, Then Carnival Had Insufficient Time to Intervene and Remedy the Risk**

The bickering went on for less than a minute. Even if Carnival Security could hear the bickering and felt that the circumstances called for physical intervention on the gangway ramp, I find there was insufficient opportunity to react. Carnival Security

58

would have to evaluate the situation, abandon their designated posts, walk through the narrow, crowded gangway, and successfully intervene with Johnson before he lunged at Berry— all in less than a minute. If Johnson was a risk-creating condition for which Carnival had a duty to remedy, then I find that Carnival Security did not have sufficient time to do so.

**9.      The Other Facts Do Not Change the Analysis**

Plaintiff points to certain facts which have no bearing on whether Carnival was on notice, whether it breached a duty and whether a breach (if it occurred) was the proximate cause of her alleged injuries.

The fact that Carnival may have incorrectly told Plaintiff that she could press charges in the United States has no relevance to these liability issues. Likewise, Plaintiff's claim that Carnival initially told her that Johnson and Berry would be confined to their cabin but that she saw them on the ship, outside their cabin, has no bearing on the threshold liability issues.

Similarly, Carnival's ultimate decision to not report the incident to the U.S. Coast Guard does not affect the evaluation of the issues listed above. Plaintiff concedes [ECF No. 193, p.13] that Carnival's "failure to report does not prove, by itself, any element of Plaintiff's case." But Plaintiff also contends that Carnival's failure to report "does suggest an attempt to downplay the severity of Plaintiff's incident, and it is evidence of a culpable mind on the part of the Defendant." The Undersigned is not convinced that these

suspicions play any role whatsoever in determining the issues outlined above.

Conclusions of Law

**1.      Carnival Had no Notice of a Risk-Creating Condition**

Plaintiff argues that Carnival had notice that Johnson was a risk-creating condition for three reasons. First, Plaintiff points to the alleged gesture as evidence of actual notice. As noted above, however, I find that Plaintiff has not proven by a preponderance of the evidence that the gesture actually occurred, so this first argument is unconvincing.

Second, Plaintiff argues Carnival should have known Johnson was a risk-creating condition because Carnival had a duty to monitor the pier where the first incident occurred. This argument fails because it imposes a duty on Carnival that exceeds reasonable care under the circumstances, as explained below.

Third, Plaintiff points to a gangway fight from 2016 as constructive notice that the gangway posed a risk. Plaintiff presented no evidence, however, that the circumstances are substantially similar. See Sorrels v. NCL (Bahamas) Ltd., 796 F.3d 1275, 1287–88 (11th Cir. 2015). In the instant case, the alleged risk-creating condition is not the gangway itself; rather, the alleged dangerous condition is Johnson's violent propensities while arguing with Berry. Thus, for this situation, constructive notice cannot be found through one prior unrelated fight on the gangway, since Johnson was not involved in those incidents.

The risk that two passengers traveling together might get into a physical fight exists on all parts of the ship. Plaintiff has not established that the gangway is a riskier

location for physical altercations than any other location on the ship.

Taken together, Plaintiff's three theories of notice are all fatally flawed. Without notice, Plaintiff's claims fail for lack of duty under Keefe and its progeny.

**2.      Carnival Had no Duty to Monitor a Foreign Pier**

Like the scenarios in *Lipkin* and *Mills*, Plaintiff's pier-security theory hinges on improperly expanding Carnival's off-ship legal duties beyond reasonable care under the circumstances. Carnival does not have a duty to provide security in foreign ports controlled by foreign agencies. *Carlisle*, *Chaparro*, *Lipkin*, *Kadylak*, and *Mills* are all clear that, under general maritime law, a cruise line's only duty past the point of debarkation is to warn of known dangers that are not open and obvious. Thus, Carnival had no duty to patrol the pier near the MSC ship. That leads to a conclusion there is no reason Carnival should have known of Johnson's earlier violent actions on the pier, which defeats Plaintiff's second theory of notice.

**3.      The Bahamian Port Authority Had a Duty to Monitor the Pier**

Plaintiff's expert, Mr. Ferraro, testified that Carnival could delegate security duties under the ISPS code through a Declaration of Security. John Butchko testified that Carnival contracts with the Bahamian Port Authority for the Port Authority to assume responsibility for safety beyond the gangway in their declaration. Thus, if Carnival had a duty under the ISPS code to be aware of anything off-ship, beyond the gangway, then Carnival could—and did—delegate those duties to the Bahamian Port Authority.

Carnival discharged any legal duties arising from the ISPS code.

**4.    If Johnson was Ever a Risk-Creating Condition on the Gangway Ramp, Then He was an Open and Obvious Danger to Plaintiff**

Despite witnessing Johnson punch Berry on the pier, Plaintiff chose to enter the gangway directly behind the couple with her four-year-old daughter. For minutes, Plaintiff stood within an arm's length of Berry in the gangway line. Even when the bickering restarted and escalated, Plaintiff failed to move or take any action to protect herself or her daughter. Instead, she thought about an elegant dinner planned for later that evening; she did not think Johnson and Berry presented a danger to her or her daughter. I have found that Carnival did not have notice that Johnson was a dangerous risk-creating condition on the gangway; however, if he was ever a danger, then the danger was open and obvious to Plaintiff.

**5.    Carnival Had no Duty to Warn of Johnson**

Carnival's only possible duty beyond the gangway was to warn of known risk-creating conditions that were not open and obvious to reasonable people through ordinary senses. If Johnson was a risk-creating condition, then Plaintiff knew of that risk because she personally witnessed the initial altercation and subsequent escalation on the gangway ramp. That risk was open and obvious to her. Because Johnson's violent propensities were open and obvious to Plaintiff, Carnival had no duty to warn Plaintiff of them (even assuming Carnival had notice through the gesture, which Plaintiff has not demonstrated by a preponderance of the evidence).

**6.     Even if Johnson was a Risk-Creating Condition and Carnival Had Notice of the Danger, Carnival Had no Duty to Intervene on the Gangway Ramp Before the Incident**

As it pertains to Johnson and Berry on the gangway ramp, both Mr. Ferraro and Mr. Butchko agree that Carnival had only a duty to adhere to its audited and approved security plan. Both have the same interpretation of it: if Carnival had notice, then it had a duty to evaluate the situation. Mr. Ferraro did not opine on this subject any further, as he conceded he is not an expert in law enforcement.

According to John Butchko, who is an undisputed security expert and has significant experience in law enforcement, Carnival's security plan requires Security Officers to evaluate the situation and proceed accordingly. It is a flexible approach that puts trust in the Security Officers to execute actions that correspond to the level of danger. I found Johnson was not a foreseeable risk-creating condition, and, if he was, Plaintiff did not adequately prove that Carnival had notice of the condition. But if he was a risk-creating condition and Carnival had notice, then Carnival had a duty to Plaintiff to *evaluate* the situation.

I find that an evaluation would show that no immediate intervention was needed on the gangway ramp. Both Plaintiff and Ms. Smith felt safe on the gangway ramp, even during the bickering, and there was no foreseeable danger because Johnson and Berry were calm. Under those circumstances, Carnival could satisfy its duty of reasonable care by waiting for Johnson in the gangway security checkpoint, swiping his Sign-and-Sail

card, and verifying his identity before speaking with him about the initial incident on the pier.

Hypothetically, once Johnson was at the security checkpoint inside the ship, Carnival Security could then discuss the situation with him without creating a security risk by foregoing their positions and entering the narrow gangway ramp. But Johnson did not appear to be a danger while in the gangway line, according to both Ms. Smith and Plaintiff. Therefore, there was no need to intervene and create a risk on the ramp. I find that to exercise reasonable care under the circumstances, Carnival owed a duty to Plaintiff to simply evaluate the situation, not to necessarily and automatically physically intervene while Johnson was in line on the narrow gangway ramp.

Thus, I conclude there was no breach of duty.

**7.    If Carnival Had a Duty to Intervene on the Gangway Ramp, then Plaintiff Did Not Prove that a Hypothetical Intervention Would Have Prevented Plaintiff's Injuries**

Even if I assume that (1) Carnival had notice, i.e., the gesture happened; (2) Johnson was a risk-creating condition; and (3) Carnival breached a duty by not intervening after the gesture, Plaintiff has not presented evidence that Carnival's lack of intervention caused Plaintiff's injuries. Without such evidence, Plaintiff cannot prove proximate cause, and her negligence claims fail on this ground, too.

Like the plaintiffs in *Lucas* and *Lipkin*, Plaintiff did not prove that, had Carnival intervened with Johnson and warned or admonished him, he would have refrained from

further violence. Plaintiff has the burden of proof, yet she offered nothing to show that Carnival's actions or omissions caused her injuries. There is no evidence supporting the speculative theory that Johnson would have heeded an admonishment or warning from Carnival or that an intervention would prove effective.

Plaintiff could have called Johnson and Berry as witnesses to support proximate causation. She did not. Plaintiff could have provided expert testimony as to how people respond to interventions or admonishments after domestic violence disputes. She offered nothing of the sort. The burden lies with Plaintiff to show that an intervention would have been effective, but her allegations and theory are only conclusory and speculative.

I cannot presume that an intervention by Carnival would have prevented Plaintiff's injuries. In fact, I found above that Johnson's erratic behavior indicates that an on-the-gangway admonishment or intervention by Carnival would have had little to no effect. Indeed, an intervention may have placed Plaintiff and other passengers in *greater* danger. I thus conclude that if Carnival had a hypothetical duty to intervene and breached that duty, then Plaintiff's claim still fails because Plaintiff did not prove by a preponderance of the evidence that Carnival's actions or omissions on the gangway actually and proximately caused Plaintiff's injuries.

### 8.  If Carnival Had a Duty to Intervene on the Gangway Ramp Once the Bickering Started, Then Carnival Had Insufficient Time to Effectively Do So

The bickering went on for less than a minute before Johnson turned violent. Assuming, *arguendo*, that Carnival had a duty to intervene at that point, general maritime

law affords Carnival reasonable time to remedy the situation. I found above, however, that it is unreasonable to expect Carnival Security to intervene within less than a minute. Accordingly, based on *Salazar* and other cases, Carnival is not liable for failing to intervene before the lunge, assuming it even had a duty to do so. *See Salazar*, 188 F. Supp. 3d at 1318.

<u>Summary of Findings and Conclusions</u>

All three theories that Plaintiff offers to establish that Carnival had notice that Johnson was a risk-creating condition are flawed: (1) she did not prove beyond a preponderance of the evidence that the gesture happened; (2) Carnival had no duty to have security prowling the pier in a foreign port; and (3) there is no constructive notice through substantially similar past incidents. Plaintiff's sole claim fails for lack of notice.

Even if Carnival had notice of the altercation on the pier, Carnival breached no duty. Any risk Johnson posed to Berry seemed to have subsided by the time they were on the gangway several minutes later, and Carnival could not foresee that Johnson posed a risk to Plaintiff.

It was reasonable for Carnival Security to wait to speak with Johnson after verifying his identity at the security checkpoint, as opposed to abandoning their positions to physically intervene on the narrow gangway ramp. Regardless, even if Carnival Security had notice and could have heard the bickering restart, there was insufficient time to safely and effectively intervene (as the bickering went on for less than a minute). Taken

together, Carnival breached no duty of care to Plaintiff.

Finally, Plaintiff has not shown proximate cause. There is no evidence to indicate that Mr. Johnson would have heeded an admonishment. In fact, circumstantial evidence indicates the situation could have been made worse with a confrontation, given his erratic behavior. Plaintiff, therefore, fails to prove notice, breach of duty, and proximate cause.

## V.     Conclusion

Based on the foregoing Findings of Fact and Conclusions of Law, it is hereby

**ORDERED** as follows:

(1)     Carnival breached no duty of care to Plaintiff.

(2)     Carnival is entitled to judgment in its favor.

(3)     Plaintiff will take nothing in this action.

(4)     Carnival is entitled to its reasonable taxable costs pursuant to Federal Rule of Civil Procedure 54, which are to be determined upon Carnival's motion.

(5)     Final judgment will be entered in favor of Carnival in a separate judgment.

**DONE AND ORDERED** in Chambers, in Miami, Florida, on September 15, 2021.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

<u>**Copies furnished to**</u>:
All counsel of record